| | |
|---|---|
| FRANK WANG,<br>　　　*Plaintiff,*<br>　　　　*v.*<br>HP, INC.,<br>　　　*Defendant.* | Civil No. 3:17-cv-2096 (JBA)<br><br><br>February 11, 2020 |

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Frank Wang alleges that his former employer, Defendant HP, Inc., failed to provide him with reasonable accommodations in violation of the Americans with Disabilities Act ("ADA"), and discriminated against him on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964. Defendant now moves for summary judgment [Doc. # 32]. For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

**I.　Background**

Plaintiff Frank Wang is an Asian man of Chinese ancestry, (Compl. [Doc. # 1] Count Two ¶ 3), and he has suffered from depression and anxiety, (*id.* at Count One ¶ 3; *see also* Parties' L.R. Stmts. [Docs. ## 32-2, 37] ¶ 64). Mr. Wang is a former employee of Defendant HP, Inc., and he resides in Southbury, Connecticut. (Parties' L.R. Stmts. ¶ 7.)

Defendant HP, Inc. ("HP"), is a global information technology company that operated under the name "Hewlett-Packard Company" until 2015. (*Id.* ¶ 1.) Prior to 2015, Hewlett-Packard was a "much larger company" that "specialized in developing and manufacturing printers," among other things. (*Id.* ¶¶ 1-2.) On November 1, 2015, Hewlett-Packard split into two separate companies. (*Id.* ¶ 4.) Hewlett-Packard spun off the portion of the company "provid[ing] servers, storage, networks, [and] consulting" under the name "Hewlett Packard Enterprise Company"

("HPE"), and it continued operating the portion that "retained the personal computing and printing business" under the name HP, Inc. (*Id.*)

Mr. Wang was first hired by HP in 2008 for the position of Senior Principal in the Healthcare Life Sciences division. (*Id.* ¶ 5.) In this role, he was permitted to work from his home in Connecticut, "but was required to travel extensively." (*Id.* ¶ 7.)

In December 2012, following an HP corporate reorganization, Plaintiff was hired as a Market Development Consultant ("MDC") under the supervision of HP executive John Tomesco. (*Id.* ¶ 10.) Plaintiff's "primary responsibility in that role was to work as part of a team supporting HP's sales process," and his "sales focus was managed services for printing," which required travel to customers' work sites. (*Id.* ¶¶ 13, 15.)

Shortly after he started as an MDC, Plaintiff was assigned a new supervisor, Randy Hickel.[1] (*Id.* ¶ 17.) Although Mr. Hickel was based at HP's Boise, Idaho office, Plaintiff was permitted to continue working out of his Connecticut home. (*See id.* ¶¶ 3, 18, 42; *see also* Hickel Dec. [Doc. # 32-6] ¶ 4.)

In early March 2013, Plaintiff joined his team members in attending the Healthcare Information and Management Systems Society ("HIMSS") conference in New Orleans. (Parties' L.R. Stmts. ¶ 19.) The events of the HIMSS conference, which provide the basis of Plaintiff's racial discrimination claim, are somewhat in dispute.

According to a March 11, 2013 memo drafted by Mr. Hickel, Plaintiff was a "source of multiple issues" at the HIMSS conference. (Def.'s L.R. Stmt. [Doc. # 32-2] ¶ 21.) That memo

---

[1] Plaintiff has "identified Hickel as the only individual at HP who allegedly discriminated against him based on his race or nationality." (Parties' L.R. Stmts. ¶ 27.)

recounted that multiple members of Plaintiff's team "expressed concern" that Plaintiff "was not communicating effectively so customers could understand him"; that Plaintiff "tends to shout, jump around and fla[il] his arms"; that Plaintiff "was at times, even confrontational"; that Plaintiff's "English is hard to understand, especially when trying to sell a solution he does not fully understand"; that Plaintiff gave explanations of product "feature[s] or benefit[s] that w[ere] not accurate"; and that Plaintiff "tried to talk repeatedly with a mouth full of food" at a professional breakfast meeting. (Ex. B (Exs. to Wang Dep.) to Def.'s L.R. Stmt. [Doc. # 32-5] at 12.)

Although Plaintiff generally objects to the memo's version of events on hearsay grounds, he himself submitted a grievance report that acknowledged that "colleagues . . . provided feedback to Mr. Hickel about my one day [on] booth[-]manning duty." (*Id.* at 65.) Plaintiff's grievance report acknowledged that one colleague said he was "too 'tight' at the booth and [he] was not very knowledgeable about the [printing and personal systems ("PPS")] products." (*Id.*) Plaintiff's grievance report further stated that this colleague's "primary concern was my accent" and that "she had a tough time . . . understand[ing] me over the phone." (*Id.* at 65-66.) Plaintiff also acknowledged that another colleague "expressed concern of my knowledge of PPS products" and "was also concerned with my accent." (*Id.* at 66.)[2]

After receiving "these multiple, independent criticisms" of Mr. Wang's behavior, Mr. Hickel "scheduled a one-on-one dinner with him on March 6, 2013." (Parties' L.R. Stmts. ¶ 26.) Mr. Hickel asked Plaintiff during this dinner to deliver an "elevator speech" about HP's products, but Plaintiff "couldn't really articulate well about those products." (Ex. A (Wang Dep.) to Def.'s

---

[2] Separately from this grievance report, Plaintiff has admitted that "he remembered talking while eating when he was at a breakfast meeting." (Pl.'s L.R. Stmt. [Doc. # 27] ¶ 29.)

L.R. Stmt. [Doc. # 32-4] at 65.) Over the course of this dinner, Mr. Hickel made multiple comments about Asian culture. Plaintiff recalled that Mr. Hickel stated that he "didn't like the Chinese culture," that he "made a comment that Asians are very short," and that he observed that Plaintiff "was talking while eating within the internal meetings" and that "this is something that [Mr. Hickel] has seen Asians do[] before." (*Id.* at 44-45.) Plaintiff testified that "before concluding the dinner [Mr. Hickel] said: What's the Plan B," which Plaintiff took to mean that "you have the Chinese accent and you are just not fit for the position." (*Id.* at 51.) When testifying on these events, Plaintiff acknowledged, "I do have accent," and that people may find it difficult to understand him. (*Id.* at 46.)

Mr. Hickel's account of the March 6, 2013 dinner is similar, but framed somewhat differently. Mr. Hickel recalled that he "talked about [his] extensive time working abroad, specifically [his] time in Japan and Korea when [he] worked for Lenovo and IBM" and that he "explained that it is a learning experience to work in a different culture." (Hickel Dec. ¶ 14.) Mr. Hickel also recalled that he "noted that as a six-foot man, [he] often felt uncomfortable when [he] stood nearly a foot taller than everyone around me in Seoul and Tokyo." (*Id.*) Mr. Hickel also declared that "[s]everal times during our dinner, [Plaintiff] attempted to speak with food in his mouth," and so Mr. Hickel used this "as a teaching point on etiquette, and . . . told [Plaintiff] that he shouldn't speak with food in his mouth when talking to others, and certainly not to customers." (*Id.* ¶ 15.)

On March 9, 2013, Mr. Wang sent Mr. Hickel an e-mail about their dinner conversation and "admitted that he lacked sufficient HP product knowledge":

> I agree that I should improve skills to deliver 'elevator speech' and I look forward to your suggestions. I also agree that I do not have enough PPS product and solution knowledge yet, an area that I shall concentrate more to improve upon to the point

that I can be more effectively articulate value propositions of those products and solutions in an 'elevator speech.'

(Parties' L.R. Stmts. ¶ 37.)

Sometime in late 2013 or early 2014, Plaintiff received his 2013 HP Performance Review. (Ex. 3B (Wang Performance Reviews) to Pl.'s L.R. Stmt. [Doc. # 37-1].) In a section titled "Manager Summary of Performance," Mr. Hickel wrote that Plaintiff needed to "work closely with the sales team to insure [he] delivered on [his] metrics of conducting workflow assessments [and] being recognized for wins and contributions to wins," as he "hit only 50% of this metric." (*Id.* at 3.) The review also discussed Plaintiff's interpersonal skills. It stated Plaintiff has a "hard work ethic" and "excellent PowerPoint skills," but that the team that participated in the HIMSS conference "identified some areas of concerns" regarding Plaintiff's listening skills and English skills. (*Id.*) Mr. Hickel concluded the performance review by assigning Plaintiff a "PA" rating, which stands for "Partially Achieves Expectations." (*Id.* at 4.)

In March 2014, Mr. Hickel was "advised by management that HP was initiating a new program entitled 'My Workplace, My HP Community,'" the purpose of which "was to encourage HP employees working remotely to return to the office, even if that meant the employee would be required to relocate." (Parties' L.R. Stmts. ¶ 40.) In an e-mail sent on March 10, 2014, Mr. Hickel informed Plaintiff and one of his colleagues that an HP executive had "mandated that all PPS employees move to an HP office whenever possible," and that he understood there was "an exception process, but this will be reviewed on a case by case basis." (Ex. 7 (Hickel E-mails) to Pl.'s L.R. Stmt. [Doc. # 37-1] at 1.) It is undisputed that Mr. Hickel "had no part in designing this program and he did not have the discretion to select [Plaintiff] to be included in this corporate relocation initiative." (Parties' L.R. Stmts. ¶ 41.)

After Mr. Hickel informed Plaintiff that this new relocation initiative applied to him, Plaintiff told Mr. Hickel "that he did not want to move to Idaho and asked if the company could make an exception for him." (*Id.* ¶ 42.) Mr. Hickel "requested that an exception be made for [Plaintiff], but HP management and Human Resources denied that request." (*Id.* ¶ 43.) Mr. Hickel memorialized that request in an April 4, 2014 e-mail to Plaintiff, which stated that he "had the opportunity to discuss . . . the My Workplace initiative to see if there may be flexibility in the physical move requirement for employees who had received a PA rating in 2013," but "senior leadership" had decided that "all are required to move to insure each employee has the opportunity to work closely with their immediate manager." (Hickel E-mails at 2.)

After the request for an exception was denied, Mr. Hickel "informed [Plaintiff] that if he did not move, he would be included in HP's next corporate workforce reduction." (Parties' L.R. Stmts. ¶ 44.) In May 2014, HP provided Plaintiff information on the Boise relocation package and gave him a deadline of June 23, 2014 to accept. (*Id.* ¶ 46.) On July 17, 2014, Plaintiff sent Mr. Hickel an e-mail declining the relocation and stating that "he looked forward to working with HP to develop a plan to transition out of his position." (*Id.* ¶ 47.) Plaintiff does not dispute that he "was aware at the time that his refusal to relocate would result in his inclusion in a corporate workforce reduction in October 2014." (*Id.* ¶ 48.)

On September 9, 2014, Plaintiff e-mailed HP Human Resources ("HR") to confirm that his last workday would be October 24, 2014. (*Id.* ¶ 49.) Plaintiff also "inquired as to whether he would be included in the corporate workforce reduction if he requested Family and Medical Leave Act (FMLA) leave before he was terminated." (*Id.*)

On October 1, 2014, Plaintiff submitted a request for short-term disability leave, which HP granted. (*Id.* ¶ 50.) It is undisputed that Plaintiff "knew that his leave request was the only reason

6

he was not terminated in October 2014." (*Id.* ¶ 51.) Plaintiff began his disability leave from HP that same month. (*Id.* ¶ 50.)

Plaintiff's disability leave was overseen by Sedgwick, a third-party administrator. (*Id.* ¶ 52.) Sedgwick handled communications with Plaintiff's doctors and received information about Plaintiff's ability to return to work and any accommodations that could be made. (*Id.* ¶ 55.)

On January 30, 2015, Plaintiff notified HP Human Resources that his doctor planned to allow him to transition back to work on a twenty-hour-per-week schedule and, in his e-mail, asked:

> If HP agrees to accommodate my doctor's transition to work plan (approved by Sedgwick already), I am going back to work part time while I am still on reduced FMLA, IS MY JOB still PROTECTED from [work-force reduction] which has never been OFFICIALLY communicated yet? Secondly, will the company OFFICIALLY notify me and [work-force reduce] me while I work 20 h[ou]rs /reduced FMLA? If so, then my job is not protected?

(*Id.* ¶ 59.) Plaintiff also testified "that around this time, he spoke by telephone to Hickel" and to Joe Wagle, another member of Mr. Tomesco's business group, and that he had "advised them that he had been approved by Sedgwick to return to work at 20 hours per week." (*Id.* ¶ 62.) Mr. Hickel told him that "his request would be reviewed by [Human Resources]," and "Sedgwick told him at some point after the call that his requested accommodation had been approved" by HP. (*Id.* ¶ 63.) But even though HP "approved [t]he accommodation at the end of January," Plaintiff's psychologist ultimately was "not in agreement with the plan." (Pl.'s L.R. Stmt. ¶ 63.) Plaintiff extended his disability leave thereafter. (Parties' L.R. Stmts. ¶ 63.)

In March 2015, Plaintiff's doctor contacted Sedgwick and requested that Mr. Wang "be placed on long-term disability leave," because he "continued to suffer from depression and was medically unable to perform the functions of his former position." (*Id.* ¶ 64.) HP granted this request. (Wang Dep. 134, 139-141.)

On July 17, 2015, Plaintiff e-mailed an HR representative to state that Sedgwick had recommended that he "develop a transition-to-work plan with appropriate accommodation." (Exs. to Wang Dep. at 52.) Plaintiff added that he "managed to talk to [HP Vice President of LES Solutions] Ed Wingate who explained to [Plaintiff] that his team [wa]s on [a] hiring freeze." (*Id.*)

On August 5, 2015, Plaintiff's psychologist informed Sedgwick that Plaintiff could "return to work on September 1, 2015 with the following accommodations": 1) Plaintiff "be employed in a setting, and workgroup in which he will have no day to day contact with former fellow employees and/or supervisors," 2) Plaintiff "be permitted to work from home for the first three or fewer months," and 3) Plaintiff's "work schedule be limited to 20 hours per week." (*Id.* at 49.) HP denied this request later that month. (Parties' L.R. Stmts. ¶ 67.)

Around this time period, Plaintiff began working with Linda Webb, an HR representative, "in an attempt to locate available positions at HP." (*Id.* ¶ 69.) Ms. Webb requested an updated resume from Plaintiff and "provided him with access to HP's job listings." (*Id.*)

In this same time period, the company, which was still operating under the name Hewlett-Packard, began preparing for the corporate split into HP, Inc., and HPE that was to occur on November 1, 2015. (*Id.* ¶ 71.) In anticipation of this split, HP "management enacted a hiring moratorium between both organizations to minimize unnecessary business disruption." (*Id.*)

In October 2015, Plaintiff learned of an open position as a Healthcare Advisory Consulting Director. (*Id.* ¶ 72.) That position was supervised by Michael Juliano, whose business group was part of the HPE division. (*Id.*) Plaintiff expressed his interest in being assigned that position following his medical leave, but Mr. Juliano "informed [Plaintiff] that he could not interview [Plaintiff] at that time because of the hiring moratorium" between the portion that was to become HP, Inc. and the portion that was to become HPE. (*Id.* ¶ 73; *see also* Pl.'s L.R. Stmt. ¶ 74.) Plaintiff

was "unable to locate another position within HP or outside the company that he found suitable." (Parties' L.R. Stmts. ¶ 75.)

On December 7, 2015, Plaintiff alerted HP that he was returning from leave and that he could work thirty hours a week without any travel restrictions. (*Id.* ¶ 77.)

On December 15, 2015, Plaintiff, who continued to operate out of his Connecticut home, reported to work on the reduced schedule. (*Id.* ¶ 80.) However, Plaintiff did not return to his previous job under Mr. Hickel's supervision; instead, he was told that his "job was to find a job." (Wang Dep. at 176.) Plaintiff reported to Mr. Wagle and Ms. Webb in this arrangement. (*Id.*) Defendant represents that Plaintiff could not return to his prior position because that position "no longer existed."[3] (Def.'s L.R. Stmt. ¶ 81.)

During his month-long return to HP, Plaintiff "started to look" for a new job within the company. (Wang Dep. at 177.) Ms. Webb also continued in her HR assignment to "help [Plaintiff] find a job," but did not locate an open job for him. (*Id.* at 178.) Plaintiff was also unable to locate a new position at HP. (Parties' L.R. Stmts. ¶ 86.)

On January 22, 2016, Plaintiff was separated from employment. (*Id.*) Plaintiff "was terminated by Joe Wagle, and Hickel had no role in his termination." (*Id.* ¶ 87.)

---

[3] According to Mr. Hickel's declaration, his business group had changed dramatically while Plaintiff was on leave: Mr. Tomesco, who had originally hired Plaintiff, left HP, and the group was subsequently downsized. (Hickel Dec. ¶ 28.) Mr. Hickel averred that, "[a]s a result, there were no open positions on our team for [Plaintiff] or anyone else" between November 2015 and January 2016. (*Id.*)

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this

showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* citing (Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

### B. Count One: Reasonable Accommodation

For a failure-to-accommodate claim to survive summary judgment, a Plaintiff must demonstrate that: "(1) Plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96-97 (2d Cir. 2009) (cleaned up).

Plaintiff claims that Defendant violated the ADA by denying two different requests for reasonable accommodation. Specifically, Plaintiff contends that 1) Defendant improperly denied his August 5, 2015 request to work twenty hours a week without contact with his former supervisor and colleagues, and that 2) Defendant failed to provide him a new job assignment after he was approved to work for thirty hours a week. (Pl.'s Opp. [Doc. # 38] at 16-17.) Defendant moves for summary judgment on this count on the grounds that the first accommodation request was unreasonable, (Def.'s Mot. at 15-16), and that the second request could not be fulfilled by HP because the company did not have a job vacancy that would have accommodated Plaintiff's restrictions. The Court will address these two requests in turn.

*a. First Request*

Defendant contends that Plaintiff's August 5, 2015 request to return to HP on a twenty-hour-per-week work schedule and to be segregated from his former supervisors and colleagues, (*see* Exs. to Wang Dep. at 49), is objectively unreasonable because, among other things, it "is effectively the creation of a new, unmanaged role," (Def.'s Mot. at 16). Plaintiff, without referencing any case law or pointing to any evidence in the record, responds only that "[t]he August 5, 2015 request, on its face, does not appear to be unreasonable." (Pl.'s Opp. at 15.)

In order to establish a prima facie ADA case, the plaintiff "must show, as part of [his] burden of persuasion, that an effective accommodation exists" that would allow him to perform his job. *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995). "This burden is not a heavy one." *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999). However, "district courts may properly grant summary judgment when a plaintiff fails to meet even this light burden." *Id.* A court is to consider the reasonableness of the proposed accommodation. *See Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 567 (2d Cir. 2000).

While there is no per se rule against an accommodation request for a change in supervisor, "[t]here is a presumption . . . that a request to change supervisors is unreasonable, and the burden of overcoming that presumption (i.e., of demonstrating that, within the particular context of the plaintiff's workplace, the request was reasonable) therefore lies with the plaintiff." *Kennedy*, 193 F.3d at 122. To that end, the Second Circuit has affirmed summary judgment rulings that conclude, for example, that a "request for an accommodation of no contact with any co-workers, and in particular, . . . supervisors, . . . was unreasonable as a matter of law." *Theilig v. United Tech Corp.*, 415 F. App'x 331, 333 (2d Cir. 2011); *see also Kennedy*, 193 F.3d at 122-23 (finding request that plaintiff "no longer work for, report to, associate with, or be influenced by her assigned supervisor

12

. . . and that [defendant company] eliminate any personal contact between plaintiff and [her supervisor]" to be unreasonable as a matter of law).

Here, Plaintiff requested to "be employed in a setting, and workgroup in which he will have no day to day contact with former fellow employees and/or supervisors." (Exs. to Wang Dep. 49.) Aside from making the conclusory statement that this accommodation was not unreasonable "on its face," (Pl.'s Opp. at 15), Plaintiff offers no demonstration that the costs of this accommodation "facially, do not clearly exceed its benefits.'" *Kennedy*, 193 F.3d at 123 (internal quotation marks omitted). As other courts have detailed, the costs of such a request are substantial. In *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998), the Third Circuit explained that "by asking to be transferred away from individuals who cause him prolonged and inordinate stress, [Plaintiff] is essentially asking this court to establish the conditions of his employment, most notably, with whom he will work" and concluded that such request would be a "wholly impractical obligation . . . on any employer." In a similar vein, the Second Circuit has found a request for transfer to a different supervisor to be unreasonable because "nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy." *Wernick v. Fed. Reserve Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996). Those same concerns exist here, where Plaintiff's request can only be satisfied by placing him in what would essentially be a new position in HP's organizational hierarchy or by allowing him to work without oversight from his former work group.

Because Plaintiff has not carried his "burden of identifying an accommodation 'the costs of which, facially, do not clearly exceed its benefits,'" the Court concludes that his August 5, 2015 request is unreasonable as a matter of law. *Kennedy*, 193 F.3d at 123 (quoting *Borkowski*, 63 F.3d at 138).

*b. Second Request*

Defendant contends that the evidence concerning Plaintiff's second request cannot support an ADA claim because Plaintiff has not "demonstrate[d] that he was qualified for a vacant position **and** that HP failed to accommodate his request to make reasonable accommodations so that he could perform the essential functions of that position." (Def.'s Mot. at 18 (citing *McBride*, 583 F.3d at 99).) Defendant asserts that when Plaintiff "returned to work in December 2015, [Plaintiff's] department had been downsized and his former role no longer existed." (*Id.* at 20.) Defendant adds that when Plaintiff "returned to work in December 2015 with a 30-hour schedule," he was "given full access to HP's internal Job Searcher application" and assigned an HR representative who "continued to work with [Plaintiff] to identify a position that would meet his accommodations" and yet not a single vacancy was identified. (*Id.* at 19.) Defendant also shows that the jobs that Plaintiff now identifies—namely, positions with Mr. Juliano and Mr. Wingate—were not actually open at the time of his return from disability leave. (*See id.* at 19 n.6; Def.'s Reply [Doc. # 39] at 5.)

Plaintiff responds that, upon his return from leave in December 2015, he should have been "retained in Joseph Wagle's business group" or "re-assigned by Edward Wingate, the Vice President responsible for the plaintiff's business unit," because "all of the other MDC's in the group were reassigned to groups supervised by Wingate, who was located in New York." (Pl.'s Opp. at 15.) Plaintiff contends that "[s]everal of the MDC's had not made their quotas and were given 'Partial Achieve' ratings for the 2015 year," but "[n]one of those employees . . . were required to change their business location as a result of the new assignment to Sales and their negative evaluations."(*Id.* at 5).[4] In light of this background, he asserts that "an inference can be drawn that

---

[4] Plaintiff bases his conclusion that his fellow colleagues had received "Partially Achieves" ratings on a phone call that he had with Mr. Wagle, during which Mr. Wagle told him that "several

14

plaintiff was not re-instated to employment with the defendant simply because he had taken a medical leave of absence." (*Id.* at 16.) Without elaborating, Plaintiff then states that he is "comparing his treatment, in December 15, with that of other MDC employees in his work group" insofar as "[t]hey were re-assigned, [and] he was terminated." (*Id.* at 17.)

A reasonable accommodation under the ADA may include, "under certain circumstances, reassignment to a vacant position." *McBride*, 583 F.3d at 97 (2d Cir. 2009) (internal quotation marks omitted). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment, including the existence of a vacant position for which [he] is qualified." *Id.* But although the "ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, 42 U.S.C. § 12111(9)(B), . . . the ADA does not require creating a new position for a disabled employee." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006).

The record here does not permit an inference that a vacant position existed. By his own repeated admission, Plaintiff "was aware at the time that his refusal to relocate would result in his inclusion in a corporate workforce reduction in October 2014" and that his position under Mr. Hickel was marked for elimination. (*Id.* ¶ 48; *see also* ¶ 49 ("On September 9, 2014, Plaintiff e-mailed HP Human Resources to confirm that his last workday would be October 24, 2014."); ¶ 51 ("Wang knew that his leave request was the only reason he was not terminated in October 2014.").) Prior to returning from leave, Plaintiff began looking for job openings, but was told by Mr. Wingate in July 2015 that his "team [was] on hiring freeze," (Exs. to Wang Dep. at 52), and by Mr.

---

Market Development Consultants had not made their sales quotas during 2015." (Wang Aff. ¶ 7.) Plaintiff believes that comment allows the "inference" that these MDCs received "Partially Achieves" rating that year. (*Id.*)

Juliano in October 2015 that Plaintiff could not be interviewed "because of the hiring moratorium" between HPE and HP, Inc., (Parties' L.R. Stmts. ¶ 73). In that same e-mail exchange with Mr. Juliano, Plaintiff acknowledged that he "had planned [on] coming back but my organization is re-organized" and that "HPI HR is to find me a position at the moment"—an acknowledgment that he no longer held a specific position at HP. (Exs. to Wang Dep. at 55.) Plaintiff was, by his own admission, subsequently "unable to locate another position within HP or outside the company that he found suitable" during his leave period. (Parties' L.R. Stmts. ¶ 75; *see also* Exs. to Wang Dep. at 52 ("Given that I am not moving to Boise, it is highly likely that I will need to leave HPI soon.").) He has also admitted that HR did not locate an open job upon his return from leave, (Wang Dep. at 178), and that he himself was unable to identify a new position at HP prior to his termination date, (Parties' L.R. Stmts. ¶ 86).

In light of the above facts, Plaintiff has failed to identify an "existing, vacant position" that could accommodate him and thus has not met his summary judgment burden. *Graves*, 457 F.3d at 187; *see also Woolf v. Strada*, No. 19-860-CV, 2020 WL 583131, at *2 (2d Cir. Feb. 6, 2020) (holding that a request for transfer and a request to work without oversight from current supervisors were not reasonable accommodations where Plaintiff otherwise "'fail[ed] to identify a suitable position' that was open, that he was qualified for, and 'to which [he] could have been transferred'" (quoting *McBride*, 583 F.3d at 96–97)). Although Plaintiff claims that he could have continued his employment at HP under the supervision of Mr. Wagle or Mr. Wingate, he has not pointed to any evidence in the record that suggests that their respective business groups had existing vacancies.[5]

_____

[5] Despite the lack of any evidence that a vacant position existed, Plaintiff asserts that the Court can nonetheless conclude that Defendant discriminated against him on the basis of disability because "other MDC employees in his group," like Alex Liff and Frank Rook, "were reassigned"

Plaintiff's ADA claim, as it pertains to this second accommodation request, thus fails as a matter of law.

## C. Count Two: Discrimination on the Basis of Race and National Origin

Plaintiff also claims that Defendant took two adverse employment actions against him that were motivated by racial animus: Defendant "singled out the plaintiff alone among his peers to be transferred," and Defendant subsequently terminated Plaintiff. (Compl. ¶¶ 9, 10.) Defendant responds that these actions were taken pursuant to neutral and non-discriminatory corporate policies, and so Plaintiff's Title VII claim must fail as a matter of law. (Def.'s Mot. at 21.)

Race and national origin claims brought under Title VII are governed by the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019). Under this framework, "the plaintiff bears the

---

while he was terminated. (Pl.'s Opp. at 17.) He cites *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000), for the proposition that a plaintiff can raise an inference of discrimination by showing that an employer treated him less favorably than a comparator who was "similarly situated in all material respects."

However, as Defendant observes, Plaintiff "cites no evidence that any of [these named individuals] were employed in the same role as Wang, had similar levels of performance, and/or had similar work experience or skill sets, nor has he indicated in his affidavit how he would have personal knowledge of any of that information." (Def.'s Reply at 6.)

The only support that Plaintiff offers for this claim is an assertion that Mr. Wagle told him that at least some MDCs "had not made their sales quotas during 2015," with the "inference" being that "these MDC employees did not meet company expectations, and received a 'Partial Achieve' rating that year." (Wang Aff. ¶ 7.) Aside from this declaration, Plaintiff does not offer any evidence that these MDCs actually received "PA" ratings, that they were otherwise similarly situated, that HP's My Workplace initiative considered employee ratings, or that the initiative even remained in effect in 2015. Plaintiff has not offered depositions from Mr. Liff or Mr. Rook, nor has he offered depositions from Mr. Wagle or Mr. Wingate that could support his claim of the comparability of these co-workers. The Court thus lacks an evidentiary basis to conclude that these MDCs are satisfactory comparators for the purposes of demonstrating disparate treatment.

initial burden of establishing a prima facie case of discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Once an employer has articulated such legitimate, non-discriminatory reasons, the "burden shifts back to the employee to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir. 2001). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

As represented at oral argument, Defendant is, for the purpose of this motion, willing to concede that Plaintiff has made a prima facie showing of discrimination. Defendant instead argues that Plaintiff's claim fails because HP had legitimate, nondiscriminatory reasons for its actions. Defendant contends that Plaintiff "was required to relocate under a neutral corporate policy, [that] he was included in a corporate workforce reduction because he refused to relocate, and [that] he was terminated pursuant to that workforce reduction when there were no vacant positions for which he was qualified at the time he returned from his lengthy leave of absence." (Def.'s Mot. at 21.)

Defendant has met its burden of showing legitimate and non-discriminatory reasons for both adverse employment actions. As to the transfer, it is undisputed that HP's My Workplace policy was initiated and designed by management in order to "encourage HP employees working remotely to return to the office." (Parties' L.R. Stmts. ¶ 40.) And as to Plaintiff's termination, it is undisputed that Plaintiff knew that his voluntary "refusal to relocate would result in his inclusion

in a corporate workforce reduction in October 2014," (*id.* ¶ 48), and that he was unable to locate another job vacancy at HP subsequent to the elimination of his prior position, (*id.* ¶ 86).

The burden thus shifts to Plaintiff to provide evidence that Defendant's explanations "were merely pretextual and that the actual motivations more likely than not were discriminatory." *Abdu-Brisson*, 239 F.3d at 469. Plaintiff points to Mr. Hickel's comments at the March 6, 2013 dinner and Mr. Hickel's 2013 Performance Review of Plaintiff as such evidence. He contends that Mr. Hickel's discriminatory animus infected Plaintiff's Performance Review, and that this Performance Review "created a domino effect which adversely impacted [Plaintiff] for the duration of his employment with the defendant." (Pl.'s Opp. at 10.)

The Second Circuit has recognized that "the impermissible bias of a single individual at any stage of the [decision-making] process may taint the ultimate employment decision." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999). This is true "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decision-making process." *Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019) (internal quotation marks and alteration omitted).

The record here is lacking in evidence that Defendant's decisions were impermissibly tainted. Even assuming *arguendo* that Mr. Hickel made the comments alleged by Plaintiff and that these comments could give rise to an inference of discriminatory intent, Plaintiff presents no evidence supporting any inference that Mr. Hickel had an actual decision-making role in ordering Plaintiff's transfer or termination. As Plaintiff admits, Mr. Hickel "had no part in designing" the My Workplace transfer policy, nor did he "have the discretion to select [Plaintiff] to be included in this corporate relocation initiative." (Parties' L.R. Stmts. ¶ 41.) Indeed, Plaintiff admits that Mr. Hickel "requested that an exception be made for [Plaintiff], but HP management and Human

Resources denied that request." (*Id.* ¶ 43.) Plaintiff further admits that he "was terminated by Joe

Wagle, and Hickel had no role in his termination." (*Id.* ¶ 87.) He has also failed to demonstrate

that the 2013 Performance Review, which was authored by Mr. Hickel, was a factor that led to

Plaintiff's transfer or termination.[6]

---

[6] When pressed at oral argument to identify any evidence in the record indicating that the "Partially Achieves" rating factored into Plaintiff's employment status, Plaintiff's counsel directed the Court to Plaintiff's testimony that a Human Resources representative told him that "the reason Mr. Juliano didn't proceed with you was because of your partially-achieved rating." (Ex. 1 (Pl.'s Excerpts of Wang Dep.) to Pl.'s L.R. Stmt. [Doc. # 37-1] at 154.)

But Plaintiff's deposition testimony is directly contradicted by his own admission that Mr. Juliano "informed [Plaintiff] that he could not interview [Plaintiff] at that time because of the hiring moratorium" between the HP and HPE divisions, (Parties' L.R. Stmts. ¶ 73), as well as Mr. Juliano's contemporaneous e-mail to Plaintiff stating that HPE "cannot proceed with you as a candidate" due to the "6 month restriction from hiring from each other," to which Plaintiff responded, "OK, I did not realize the hiring moratorium . . . just took effect," (Exs. to Wang Dep. at 55). The contradictory deposition testimony from Plaintiff is thus insufficient to create genuine dispute of material fact as to whether Plaintiff's Performance Review was a factor in his transfer or termination.

Plaintiff's counsel also directed the Court to Plaintiff's undisputed deposition testimony that Mr. Hickel had told him that HP was making exceptions to the My Workplace policy based on employee ratings. (Pl.'s Excerpts of Wang Dep. at 76.) This testimony corresponds with Mr. Hickel's March 10, 2014 e-mail to Plaintiff, stating that management "has mandated that all PPS employees move to an HP office whenever possible" but that "[t]here [wa]s an exception process." (Hickel E-mails at 1.) In a follow-up e-mail on April 4, 2014, Mr. Hickel then clarified that he "had the opportunity to discuss with [Mr. Tomesco] the My Workplace initiative to see if there may be flexibility in the physical move requirement for employees who had received a PA rating in 2013" and that "senior leadership" had decided that "*all* are required to move to insure each employee has the opportunity to work closely with their immediate manager." (*Id.* at 2 (emphasis added).) From this evidence, a rational fact-finder could certainly conclude that there was confusion as to the role of employee ratings in the transfer process. However, it would take an unreasonable inferential leap to conclude that Plaintiff would have been exempt from the My Workplace policy but for his receipt of a biased "Partially Achieves" rating.

In the absence of any direct or circumstantial evidence that would lead a reasonable juror to find that Mr. Hickel—or the 2013 Performance Evaluation that he authored[7]—contributed to Plaintiff's transfer order and termination, Plaintiff has not met his burden of showing that Defendant's reasons for its actions were pretextual.

### III. Conclusion

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 32] is GRANTED.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 11th day of February 2020.

---

[7] As an alternative ground for summary judgment, Defendant's counsel noted at oral argument that the 2013 Performance Review was based on objective criteria that Plaintiff could not meet and that these criteria—which measured wins per industry—were legitimate and non-discriminatory. The Court agrees. An examination of the 2013 Performance Review shows that Plaintiff "only hit 50%" of his metric "of conducting workflow assessments, [and] being recognized for wins and contributions to wins." (Wang Performance Reviews at 3.) Although Plaintiff testified that he believed the metrics had a "disparate[] impact" on him because he worked with more industries than other MDCs, he did not dispute that metrics applied to every employee in his position, nor did he offer evidence that the metrics themselves were discriminatory on the basis of race or national origin. (Pl.'s Excerpts of Wang Dep. at 72.)